**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**(Tampa Division)**

PARTSHAWK, LLC, a Florida limited                    CASE NO.: 8:19-cv-00353-CEH-AEP
liability company,

      Plaintiff,

vs.

TRIBRIDGE HOLDINGS, LLC, a Delaware
Limited liability company,

      Defendant,

_____/

**AMENDED COMPLAINT**

      PartsHawk, LLC through undersigned counsel sues Defendant, Tribridge Holdings, LLC and alleges:

**JURISDICTION AND VENUE**

      1.     This is an action for damages exceeding $15,000.00 exclusive of interest costs and attorney's fees.

      2.     Plaintiff is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

      3.     Defendant is a Delaware limited liability company with its principal place of business in Tysons Corner, Virginia. Defendant is a software development and programming company that has its offices in Hillsborough County Florida and entered into a contract in Miami-Dade County, Florida, provided services in Miami-Dade County, Florida, and services customers who reside and principally do business in the Miami-Dade County, Florida. Therefore, Plaintiff does regular and not isolated business in the State of Florida.

4.      Venue is proper in this Court because the parties' contract has a forum selection clause making Hillsborough County the venue where actions must be brought if initiated by PartsHawk against Tribridge.

## GENERAL ALLEGATIONS

5.      PartsHawk is web-based seller of auto parts. PartsHawk was launched based on the concept of making millions of auto parts available to consumers at lightning speed through a massive distribution network operating on a robust internet platform. PartsHawk's objective from inception was to offer consumers immediate access to millions of auto parts to enable them to instantly locate and purchase specific parts to match their specific vehicle's needs.

6.      Central to PartsHawk's business model from conception is the need for a software solution operating on a web platform that could speedily accommodate, transfer and process millions of data records to make them immediately available to users. To build its platform, PartsHawk sought out the advice of Microsoft support representatives for a recommendation on how to approach designing and building a website to meet these needs. Microsoft introduced PartsHawk to Defendant Tribridge, who represented its qualifications to deliver a solution with the necessary capacity, speed and functionality to meet PartsHawk's business needs.

7.      The specifications for the solution and the volume of records and data that the solution would need to handle was clearly articulated to Tribridge's sales staff and engineers prior to execution of any agreement between the parties. Tribridge's sales staff and engineers were repeatedly informed that PartsHawk works with over a million items in its automotive catalogue, which, considering the various attribute and fitment data records that go along with each item would require that over 90 million records be regularly imported into the system and managed and updated to satisfy PartsHawk's business requirements.

8.      Essential to building this solution was selecting an e-Commerce platform and application that could accommodate the volumes of data and records that would be required at the necessary speed. To that end, Parts Hawk expected that Tribridge would have the qualification and expertise to assure that even a business platform that PartsHawk might select would be suitable and have the volume capacity and processing speed to run its new website.

9.      Starting in late January 2017, PartsHawk had multiple meetings on the phone and in person with Tribridge's Business Development Manager, Jake Halusic, to discuss PartsHawk's needs for its Website. In an email dated February 8, 2017 from Halusic, Tribridge represented that it was "familiar with the industry" and "confirmed that NetSuite would be the best solution fit for what [PartsHawk was] trying to accomplish." Tribridge was informed (and even sent the exact specs) of the logic PartsHawk used to calculate pricing, and even stated as much in their "Budget & Planning Letter." A copy of this Email is attached hereto as Exhibit "A."

10.      On February 22, 2017, Tribridge scheduled a demonstration that was attended by representatives of Tribridge, including Halusic, and NetSuite to show PartsHawk what was being planned and to push the NetSuite platform. A copy of the "Demo Agenda" provided by Halusic to PartsHawk is attached hereto as Exhibit "B." At that meeting, PartsHawk again made its functionality, data processing and volume requirements very clear, and again reinforced the objectives that the website had to accomplish to serve PartsHawk's central business needs. At this meeting, Tribridge again reassured PartsHawk of its competency, the suitability of the NetSuite platform to run the solution, and that ample resources would be committed to deliver the solution by September 2017.

11.      Based on its clear and explicit representations as to its experience developing, designing and executing, and its qualifications and technical ability to develop, design and execute similar solutions with other auto makers and auto parts vendors, and its claim of expertise to deliver

a solution that would meet PartsHawk's on-line business needs, Tribridge knew or should have known that NetSuite could not handle PartsHawk's data volume needs, and that the use of the NetSuite platform, even if selected by PartsHawk based on its own due diligence, would render it impossible to deliver an e-Commerce website that would meet PartsHawk's specifications. Alternatively, assuming NetSuite was a suitable e-Commerce platform on which to design and integrate PartsHawk's Website solution, contrary to its representations, Tribridge was utterly incapable of executing, and was unqualified and without the skill to deliver, the Website Tribridge represented it could execute and deliver to meet PartsHawk's needs.

12.     Tribridge concealed from PartsHawk that it was neither qualified to design and execute nor capable of delivering a solution with PartsHawk's specifications on the NetSuite operating system, but instead represented that it was capable of delivering a solution PartsHawk's solution on the NetSuite Platform with the specified functionality of the system it was hired to design, develop and execute by September 2017. Tribridge's failure disclose its inability to develop the Website on the NetSuite system now makes sense, as PartsHawk discovered that NetSuite pays substantial commissions to referral partners who secure the purchase of its application. The substantial remuneration Tribridge received obviously motivated Tribridge to conceal its inability to deliver the Website using the NetSuite platform.

13.     In a phone call to Tribridge on or about March 28, 2017, Mike Perrin, PartsHawk's CIO, asked 6 specific pre-sale questions about NetSuite, and his very first question was: "Will there be any sort of data and/or transactional limitations (especially any that entail additional fees)?" to which Tribridge definitively replied there weren't.

14.     As of April 5, 2017, PartsHawk still had some unanswered questions concerning pricing and functionality, but Halusic urged PartsHawk not to worry, and represented that "a lot of [these questions] would be answered during design." In the same email string Halusic

represented that "We can work on this, but we need to get the contracts in today as we are holding resources and have other deals signing. I think if it goes past today we are going to have to release the resources and it could push the start date 3-4 weeks." A copy of this email thread is attached hereto as Exhibit "C."

15.     It was PartsHawk's clear understanding from Halusic's representations as to the resources being committed to PartsHawk's project, both in his April 5, 2017 email attached as Exhibit "C," and in oral representations made by him at or near the time this email was sent, that the necessary personnel, including software engineers, website designers and staff who were trained on and well versed in the NetSuite platform and its functionality and in fitment design and implementation were being set aside and devoted to performing and completing PartsHawk's project by September 2017. PartsHawk later learned from Tribridge engineers who were working on the project after the SOW and MSA were signed that, at the time the representations as to resources were made, the personnel with the technical skills and expertise that Halusic represented were being committed to the Project had never been committed to PartHawk's project because they did not exist. In or about July 2017, Matt Forsythe, Tribridge's sales manager and Halusic's boss verbally admitted to PartHawk in a phone call that there was not enough skilled personnel at the time the agreements were executed and up through that point to meet the needs to execute PartsHawk's Website, and that they were trying to hire additional staff to assign to PartsHawk's project.

16.     In reliance on Tribridge's representations as to: (1) its qualifications and ability to design and deliver a solution to meet PartsHawk's specific data volume, capacity, functionality and processing needs to serve its primary business objectives; (2) the resources it had committed to delivering a completed website with all of the capabilities and features promised by September 2017; and (3) the urgency of entering into an agreement so as not to lose committed resources and

delay completion of the project, on April 5, 2017, PartsHawk executed a Master Service Agreement and Statement of Work, under which Tribridge committed to deliver the website with all of the functionality, data volume capacity, speed of migration of data and processing capability and speed (the "Website") that could go live by September 2017. A copy of the MSA and SOW is attached hereto as Exhibit "D."

17.    In reliance on these same representations, PartsHawk executed a three (3) year agreement with Oracle to procure the NetSuite Application as the e-Commerce platform on which to operate the site being designed and supported by Tribridge.

18.    Neither the MSA nor the SOW specifically addresses: (a) Tribridge's expertise, skill and qualifications to build the Website on the NetSuite platform, (b) the resources consisting of the number of technical and skilled personnel being reserved prior to execution of the MSA and SOW for the development and construction of the Website, or (c) the urgency to enter into these agreements under threat of losing purportedly committed resources and delaying the completion of the project.  All the misrepresentations of fact forming the basis of the three areas of misrepresentation alleged herein were made prior to the parties executing the MSA and SOW, and do not stem from any contractual obligation in or post contractual performance of the MSA and SOW.

19.    Once the MSA and SOW were signed, and PartsHawk was committed to a three-year contract with Oracle, it became almost immediately apparent that PartsHawk had been lied to, and that Tribridge was out of its depth and neither had the capabilities nor the resources to deliver the solution contracted for by the September 2017 deadline. In fact, PartsHawk learned through discussions with Tribridge engineers that Tribridge grossly oversold its ability to deliver the Website contracted for within the delivery deadline, and that Tribridge did not have the technical and skilled personnel resources to deliver a workable Website to meet PartsHawk's

specifications by the represented due date. This was further confirmed in the statements made by

Matt Forsythe, Tribridge's sales manager and Halusic's boss alleged in paragraph 15 above.

20.    PartsHawk also learned that negotiations to enter into the MSA and SOW coincided

with an impending sale of Tribridge to DXC, prompting its sales staff to take a "bring in business

at all costs" approach, and overpromise execution on a Website it was incapable of delivering.

21.    Making matters worse, after work started on the Website, it came to light that

Tribridge did not have the technical capability or expertise to build a solution on the NetSuite

platform that would meet PartsHawk's needs and specifications to seamlessly process, import and

update PartsHawk's catalogue of over 90 million records. Tribridge was only able to get its

solution to accept records in batches of 25,000 at a time and was unable to get it to accept any

import files over 25,000 records. As such, by example, a record set with 1 million records would

have to be broken down into 90 individual datasets, and then each data set would have to be

manually imported and completed and/or errored out before the next data set can be uploaded.

22.    Tribridge attempted to deflect its failures by claiming to have been unaware of the

pricing calculation processing requirements that PartsHawk had, and informed PartsHawk that

NetSuite would be unable to process that amount of data regularly so PartsHawk would have to

develop its own secondary system to perform the pricing calculations.  This assertion was of course

plainly false – PartsHawk had specifically addressed these matters with Tribridge in emails, during

pre-MSA meetings and at the demonstration prior to entering into the MSA and SOW.

23.    Tribridge further attempted to deflect its own lack of qualifications and expertise,

and the lack of resources to deliver a solution on the NetSuite platform by blaming the slow

migration and processing of data on the format in which data was being transferred. A copy of this

email, sent in February 2018, over four months after the Website was supposed to be delivered, is

attached as Exhibit "F." This too was ruse to cover up Tribridge's complete failure of its principle

purpose, as a conference call with representatives of WHI, the data supplier transferring the data, confirmed that the records were being transmitted in the typical format contemplated by the parties' agreement and pursuant to the SOW.

24.    Further evidence of Tribridge's misrepresentations as to its competence to deliver the Website could be found in its inability to execute the fitment part of the Website. The MSA and SOW provided a cap on the fitment charges to design and deliver the Website, but the hours being spent to try and deliver what was promised were far greater than what the cap would accommodate. Tribridge then attempted to apply fitment hours into other categories that were never touched in order to bill those fitment hours by burying it in other purported scopes of work. By example, on the October 2017 bill, Tribridge applied 223 hours of billable time to "My Garage" when it performed no work on this scope, and which in actuality was time spent above the cap for fitment.

25.    A further example of Tribridge's dishonesty was revealed when, in order to induce PartsHawk to make an additional payment under the MSA, Tribridge represented to PartsHawk in an email dated October 27, 2017 that it was only "about 10-20 hours from completing [the Website] in accordance with the Statement of Work," and needed additional funds to finish. A copy of this email from Paul Forsyth, Paul Forsythe, Tribridge's senior director for NetSuite Solutions, is attached hereto as Exhibit "E." This representation of course was another falsehood to induce PartsHawk to pay more money towards Tribridge's futile efforts. Tribridge was nowhere near completion of the Website. Ultimately, Tribridge had no choice but to come clean on its inability to deliver on its promises under the SOW and admit that it could not deliver the Website that was promised.

26.    PartsHawk had already invested substantial sums with Tribridge, and at the urging of Tribridge had been induced to commit substantial funds and resources to NetSuite.

Consequently, to avoid having to start the whole process again, it stayed with Tribridge to allow it to try and deliver the Website as promised, albeit late and at significant loss of revenues caused by the delay in delivering a Website that was ready to go live by the promised due date.

27.    Shockingly, on March 27, 2018, nearly a year after the MSA and SOW were executed, and about six months after the deadline to deliver the finished product and when it was scheduled to go live, Paul Forsythe, Tribridge's senior director for NetSuite Solutions, wrote an email to PartsHawk making it clear that Tribridge would not deliver, and indeed could never have delivered, the Website it promised: "Up to this point the Tribridge team has focused on delivering a "proof of concept" that fitment would work within NetSuite and that SCA would provide an expandable website that integrates to NetSuite for order processing, customer, vendor and finance management." This email proposed design changes that suggested that Tribridge was essentially starting from scratch. A copy of this email is attached hereto as Exhibit "G."

28.    Dismayed at how Tribridge could legitimately claim that its efforts to that point had been focused on delivering a proof of concept when the parties' MSA and SOW so clearly committed Tribridge to delivering a fully functional Website that met all of PartsHawk's data volume and functionality requirements five months earlier, PartsHawk had had enough. PartsHawk realized that Tribridge would never deliver, and indeed, could never have delivered the solution PartsHawk was induced to contract for, and exercised its right to cancel the MSA and SOW.

29.    All conditions precedent to the filing of this action have been performed, met or waived.

30.    PartsHawk has retained the law firm of Blaxberg, Grayson, Kukoff & Forteza, P.A. and is obligated to pay them a reasonable fee for their services.

## COUNT I
## FRAUD IN THE INDUCEMENT

31.    Plaintiff realleges paragraphs 1 through 18 as if fully set forth herein.

32.    As more particularly alleged in paragraphs 5 through 18 above, in reliance on Tribridge's representations as to (1) its qualifications and ability to design and deliver a solution to meet PartsHawk's specific data volume, capacity, functionality and processing needs to serve its primary business objectives; (2) the resources it had committed to delivering a completed website with all of the capabilities and features promised by September 2017; and (3) the urgency of entering into an agreement so as not to lose committed resources and delay completion of the project, on April 5, 2017, PartsHawk executed a Master Service Agreement and Statement of Work, committing to deliver the website with all the functionality, data volume capacity, speed of migration of data and processing capability and speed (the "Website") that could go live by September 2017.

33.    Tribridge knew that these misrepresentations were false when they were made, and that it could not and never intended to fulfill its obligations under the MSA and SOW.

34.    In reliance on these representations, PartsHawk executed a Master Service Agreement and Statement of Work, committing to deliver the website that could go live by September 2017. A copy of the MSA and SOW is attached hereto as Exhibit "D."

35.    In reliance on these same representations, PartsHawk executed a three (3) year agreement with Oracle to procure the NetSuite Application as the e-Commerce platform on which to operate the site being designed and supported by Tribridge.

36.    Evidence that pre-contractual representations Tribridge made to induce PartsHawk to enter into the MSA and SOW came to light almost immediately after the MSA and SOW were signed, and is described in paragraphs 21 through 29 above.

37.    As a direct and proximate result of being fraudulently induced to enter into the MSA and SOW, Plaintiff has been damaged. These damages include direct damages in the form of having to pay Defendant substantial sums to deliver a website that it could never have delivered, the substantial sums Plaintiff has had to pay and must continue to pay for the NetSuite platform, and consequential damages in the form of lost profits arising from the delay in delivering a website on which Plaintiff could conduct its business.

38.    Pleading in the alternative, and subject to election of remedies, Plaintiff respectfully alternatively requests that the MSA and SOW be rescinded, that all funds paid to Defendant be refunded with interest, that Defendant reimburse Plaintiff for the sums it has paid to Oracle for the NetSuite Platform, and that Defendant be directed to pay the balance of the contract with Oracle for  the NetSuite Platform to place the parties back in the positions they were in before the MSA and SOW were entered into.

WHEREFORE, Plaintiff demands judgment in its favor for:

a.   Direct, consequential and special damages including lost profits;

b.    In the alternative and subject to election of remedies, rescission of the MSA and SOW, and that all funds paid to Defendant be refunded with interest, that Defendant reimburse Plaintiff for the sums it has paid to Oracle for the NetSuite Platform, and that Defendant be directed to pay the balance of the contract with Oracle for  the NetSuite Platform to place the parties back in the positions they were in before the MSA and SOW were entered into.

c.   Prejudgment interest;

d.   Court Costs; and

e.   Such other relief the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

39.    Plaintiff realleges paragraphs 5 through 7 and 21 through 30 as if fully set forth herein.

40.    On or about April 5, 2017, PartsHawk and Tribridge entered into the MSA and SOW (the "Agreement") attached as Exhibit "D" under which Tribridge committed to deliver an e-Commerce Website to PartsHawk with all of the functionality, data volume capacity, speed of migration of data and processing capability and speed provided for therein (the "Website") that would go live by September 2017.

41.    Tribridge breached the Agreement as it failed to fulfill its obligations to deliver the Website with the agreed specifications and functionality prescribed in the SOW by the contracted deadline or within a reasonable time thereafter to meet PartsHawk's reasonable expectations under the parties' Agreement.

42.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged.

43.    As more particularly described in paragraphs 21 through 30, Tribridge was grossly negligent in its failure to perform under the Contract, or alternatively, the acts Tribridge committed and misrepresentations it made described in paragraphs 21 through 30 constituted willful misconduct under paragraph 10 of the MSA that entitles PartsHawk to recover consequential damages including lost profits.

WHEREFORE, Plaintiff demands judgment in its favor for:

    a.    Damages, including consequential damages and lost profits;

    b.    Prejudgment interest;

    c.    Attorney's fees;

d.  Court Costs; and

f.   Such other relief the Court deems just and proper.

Date November 18, 2019.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of November, 2019, a copy of the foregoing has been electronically filed with the Clerk of the Court via the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

Eric J. Partlow, Esq.
Chelsea C. Harrison, Esq.
ADAMS AND REESE, LLP
101 E. Kennedy Blvd., Suite 4000
Tampa, Florida 33602
Telephone: (813) 402-2880
Facsimile: (813)  402-2887
Email: Eric.Partlow@arlaw.com
Email: Ann.Jones@arlaw.com
Email: Chelsea.Harrison@arlaw.com
Email: Lisa.Stallatrd@arlaw.com

**BLAXBERG, GRAYSON, KUKOFF & FORTEZA, P.A.**
*Attorneys for Plaintiff, PartsHawk*
Ingraham Building
25 Southeast 2nd Avenue, Suite 730
Miami, Florida  33131
Telephone: 305-381-7979
Facsimile: 305-371-6816
Email: ian.kukoff@blaxgray.com
Secondary e-mail: kukoff.assistant@blaxgray.com

By: /s/ Ian J. Kukoff
     Ian J. Kukoff, Esq.
     Florida Bar No.: 827126

13